FILED

99 AUG 27 PM 3: 22

U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

ANGUS LAMAR OLIVER,                )
                                   )
            Plaintiff,             )
                                   )
vs.                                )        Case No. CV96-TMP-1694-NE
                                   )
CATHY MULLINS,                     )
JENNIFER COOK, and CORRECTIONAL    )
MEDICAL SERVICES, INC.,            )
                                   )        ENTERED
            Defendants.            )
                                            AUG 2 7 1999

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action pursuant to 42 U.S.C. § 1983 in which an Alabama state prisoner alleges

that the defendants violated his Eighth Amendment right to be free from cruel and unusual

punishment by being deliberately indifferent to his need for medical treatment. Additionally, he

asserts a claim under the Alabama Medical Liability Act, Alabama Code § 6-5-480 through -488,

and the Alabama Medical Liability Act of 1987, Alabama Code § 6-5-540 through -552. After the

parties consented to trial and judgment before the undersigned magistrate judge under 28 U.S.C.

§ 636(c), a non-jury trial occurred on June 29, 1999. The only defendants remaining in the action

at that time were Nurses Cathy Mullins and Jennifer Cook, and their employer, Correctional Medical

Services, Inc. Based on the evidence presented at trial and the oral and written arguments submitted

by counsel, the Court makes the following findings of facts and conclusions of law.

Findings of Fact

1. Plaintiff is an Alabama state prisoner who, at the time of trial, was housed at the

Montgomery Work Release Center. He has been confined at one time or another at the Kilby

Correctional Facility, the Donaldson Correctional Facility, the St. Clair Correctional Facility, the Red Eagle Honor Farm, and the Staton Annex (Elmore), as well as at the Limestone Correctional Facility where the events at issue in this case took place. During the relative period, medical services were provided to state inmates by Correctional Medical Services, Inc. (CMS) through a contract with the Department of Corrections.

2. In December 1986, while in prison serving a sentence for buying and receiving stolen property, plaintiff's right eyeball was removed because of a cancerous tumor growing on it. The surgery was performed by Dr. Michael Callahan at the Eye Foundation Hospital in Birmingham, Alabama. The right eye socket has been a chronic health problem for plaintiff. Over the years, he has had repeated instances of infection, pain, drainage, and bleeding from it. Generally, treatment has consisted of washing the eye socket several times daily (usually two to four times) with a mixture of 50% water and 50% hydrogen peroxide, and then applying an antibiotic ointment. Ointments used have included Neosporin, Polysporin, Triple Antibiotic Ointment (TAO), and Gentamicin. At times, an eye patch has been ordered to cover the socket, but this was not consistently the case. For a brief period in March 1988, antibiotic ointments were discontinued in favor of painting the eye socket with merthiolate, but plaintiff refused this treatment, and it was replaced by the same regimen of washing and applying antibiotic ointment.

3. On October 10, 1995, plaintiff was transferred to the Limestone Correctional Facility. The CMS site administrator at Limestone was defendant Mullins, who was also director of nursing at the facility. Nurse Mullins has been a registered nurse since 1971. In 1995, Dorm 16 at Limestone housed a correctional program for repeat offenders known as the "Alternative Thinking Unit," but pejoratively called the chain gang. Although plaintiff was assigned to Dorm 16, he was

2

medically screened by Nurse Mullins the day he arrived, and she placed a medical hold on him to excuse him from outdoor work until he could be evaluated by the doctor.

4.  Plaintiff was examined by Dr. Daily the next day, October 11, 1995.  He noted that plaintiff's right eye socket was "irritated, reddened, and [had] some drainage." He ordered the same peroxide and water eyewash twice daily with Neosporin ointment and an eye patch.  He further referred him to the optometrist, Dr. Bradford, and prohibited him being placed on an outdoor work detail.  Dr. Daily also noted that he would discuss plaintiff with Dr. Lyrene, the state-wide medical director for CMS.  The Medication Administration Record ("MAR"), contained as a exhibit to the Special Report filed September 25, 1996, shows that Dr. Dailey's orders were followed from October 12 to October 18, 1995, when they were discontinued with the notation "non-compliant."

5.  Plaintiff was examined by Dr. Bradford on October 1995, who concluded that plaintiff needed a "free world" evaluation of his eye socket to rule a recurrence of cancer.  He also measured plaintiff for "polycarb" safety glasses.

6.  On October 24, 1995, Nurse Mullins gave plaintiff a KOP ("keep on person") slip that authorized him to have in his possession "4 x 4's, patches, & Neosporin opthalmic ointment." Thius enabled plaintiff to do his own cleaning and medication.

7.  On October 26, 1995, plaintiff submitted a request for medical treatment for a head cold, but made no complaint about his eye socket.

8.  Because plaintiff was housed in Dorm 16, pill call nurses came to the dormitory three times daily to provide medical treatments.  Defendant Cook was the nurse who handled the evening pill call on the 3:00 p.m. to 11:00 p.m. shift.  Nurse Cook is a license practical nurse.  She routinely stocked her medication cart with the supplies needed by plaintiff, including hydrogen peroxide, antibiotic ointment, eye patches, and cleaning gauzes.  On November 1, 1995, she also gave plaintiff

3

a KOP slip, authorizing him to possess eye patches, hydrogen peroxide, Q-tips, disposable glasses, and "2 x 2's." The MAR reflects that plaintiff was issued a full pack of "2 x 2's" on November 22,1995, and that he had the KOP slip for Neosporin through the entire month.

9. On November 7, 1995, however, plaintiff submitted a medical request form, complaining of pain in his eye. The pain has been described as like a toothache and headache at the same time. He was seen that day by Dr. Dailey, who noted that plaintiff has "purulent drainage" from the socket and a "blister" in the lower right corner. There is no notation of treatment, however. On November 12, 1995, he filed yet another request for medical treatment, this time complaining about hemorrhoids and a rash on his face. There was no mention of pain or infection in his eye socket.

10. On November 25, 1995, plaintiff filed an administrative grievance, complaining that he was having trouble getting "4 x 4" gauze for cleaning and the correct size eye patches. He stated that Nurse Cook would not give him eye patches because he was receiving "4 x 4's," and that Nurse Mullins had changed his antibiotic ointment from Neosporin to TAO. As a result of this grievance, he was examined on November 28, 1995, by Dr. Hammack, who found that plaintiff had bleeding from a "granulated" area in the center of the socket "that probably reflects infection in the skin graft." He determined that he would consult with the medical director, Dr. Lyrene, to obtain approval to have plaintiff evaluated by Dr. Callahan at the Eye Foundation Clinic. This was approved the next day, and Nurse Mullins scheduled the appointment for December 12, 1995.

11. Before he could be seen by Dr. Callahan, plaintiff filed another administrative grievance on December 8, 1995, repeating his complaint that he was not being given appropriate cleaning gauze and eye patches. Although filed by plaintiff in December 1995, neither Nurse Mullins nor Nurse Cook were aware of it until several months later when Nurse Mullins received a copy of it on May 16, 1996.

12. Plaintiff saw Dr. Callahan at the eye Foundation Hospital on December 12, 1995, and reported that he had pain, bleeding, and oozing from the socket. Dr. Callahan then gave him instructions to "clean with 50/50 peroxide using Q-tips & 4 x 4's three times a day," "apply polysporin ointment (neosporin ointment) three times a day," and "cover with eye patch 2 5/8 x 2 1/8 size eye patch." Upon his return to the prison, plaintiff saw Dr. Rampulla on December 15, 1995, who noted "The Eye Foundation doctor said they may have to make a muscle flap [for the socket]." Again, the MAR shows that, despite some initial confusion, Dr. Callahan's orders were followed from December 12, 1995, to March 12, 1996, when they were discontinued.

13. During January to April 1996, plaintiff had few problems with his eye socket. He was seen and tested a number of times for other ailments, including hemorrhoids, rectal bleeding, anemia, and high cholesterol, but the medical records do not reflect complaints about his socket. There is no evidence that plaintiff was denied any supplies needed to clean and medicate his socket during this time.

14. Plaintiff next complained about his eye socket on April 15, 1996, but there is no record that he was seen by a doctor until April 26, when Dr. Ramplulla determined that the socket was infected and oozing "pus – exodate [sic]." He ordered a "culture" and prescribed three medications, but said nothing about the cleaning of the socket. On May 29, 1996, the results of the culture of the socket revealed "staphylococcus aureus heavy growth."

15. Beginning May 3, 1996, medical personnel began substituting TAO for the Neosporin previously ordered by Dr. Callahan. On that date, a Nurse Garlen wrote:

> Issued TAO ointment per order of 5-1-96. Inmate states he will take the TAO even tho [sic] it will blister his eye socket and also states that the doctor knows it will blister his eye. He wants to show the doctor himself what it does for his eye.

5

She also issued plaintiff a KOP slip for him to keep the TAO ointment in his possession. Dr. Rampulla ordered the change to TAO. Before his transfer to Limestone, plaintiff had received TAO for his eye at other institutions.

16. On May 15, 1996, Dr. Rampulla again examined plaintiff and noted, "eye socket bone showing. No pain. Erosion of left [sic] eye socket." He scheduled plaintiff for another appointment three weeks thereafter. On June 1, 1996, Dr. Rampulla again directed plaintiff to use Neosporin Opthalmic ointment. This was change, apparently, to Ocutricin on June 10 for 45 days until July 25, 1996.

17. Dr. Bradford, the optometrist, saw plaintiff on July 11, 1996, and concluded that he had no medical need for "shades." He was concerned about receiving information on whether lesions around the eye socket had been biopsied to check for recurrence of the cancer.

18. From July to September, the medical records do not reveal that plaintiff complained about his eye or lack of cleaning supplies. Apparently no requests for treatment related to the eye socket were filed, nor were any administrative grievances.

19. Plaintiff was next evaluated in September 1996, when Dr. Hammack approved him for evaluation by the Eye Foundation Hospital due to the exposed bone in the right eye socket. He was then transferred to the prison hospital at Kilby for further treatment of his eye socket on September 30, 1996. Thereafter, he was treated at Kilby, including surgery to engraft over the eye a flap of muscle and skin taken from his arm. Neither Nurse Mullins nor Nurse Cook had any further contact with him after his transfer to Kilby.

Conclusions of Law

A. *Eighth Amendment*

Plaintiff's first claim asserts that Nurses Mullins and Cook violated his Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent to his serious medical need for supplies to clean and medicate his eye socket to prevent infection. Relying on Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), he contends that Mullins and Cook failed and refused to give him cleaning gauze and eye patches, which caused his eye socket to worsen and deteriorate from infection resulting from his inability to properly clean and medicate it.

In order to establish liability under § 1983 for inadequate medical treatment, a prisoner must show that a failure to provide medical treatment amounted to cruel and unusual treatment in violation of the Eighth Amendment. The United States Supreme Court has held that it is only "deliberate indifference to serious medical needs of prisoners which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment." Estelle v. Gamble, supra. "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991), quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986). The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. Bass v. Sullivan, 550 F.2d 229 (5th Cir.), *cert. denied*, 434 U.S. 864 (1977). Mere negligence is insufficient to support a constitutional claim. Fielder v. Bosshard, 590 F.2d 105 (5th Cir. 1979). As stated by the *Estelle* Court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at 106. Therefore, an accidental or inadvertent failure to provide

7

medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment. *See* Ramos v. Lamm, 639 F.2d 559 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981). Neither will a mere difference of opinion between an inmate and the institution's medical staff, as to treatment and diagnosis, alone give rise to a cause of action under the Eighth Amendment. Smart v. Villar, 547 F.2d 112 (10th Cir. 1976); *see also* Estelle v. Gamble, 429 U.S. at 106-08. Likewise, the disagreement between two doctors, as to the course of treatment, also does not state a violation of the Eighth Amendment, since there may be several acceptable ways to treat a medical condition. White v. Napoleon, 897 F.2d 103, 110 (3rd Cir. 1990).

In Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S. Ct. 1492, 89 L. Ed. 2d 894 (1986), the Eleventh Circuit held that an inmate's dissatisfaction with the medical treatment provided by the prison did not constitute a violation of the Eighth Amendment as long as the treatment provided did not amount to deliberate indifference. The Eighth Amendment is implicated only when the prison doctors or guards intentionally and deliberately deny or delay access to medical attention to serious medical conditions. *Barfield v. Brierton*, 883 F.2d 923, 938 (11th Cir. 1989). Two components must be evaluated to determine whether the plaintiff has been subjected to cruel and unusual punishment. "First, [the court] must evaluate whether there was evidence of a serious medical need; if so, [it] must consider whether [the defendants'] response to that need amounted to deliberate indifference." Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989);. Clearly, "not every illness or injury invokes the constitutional protection -- only those that are `serious' have that effect." Evans v. San Quentin State Prison, 1991 WL 438695, at *1 (N.D. Cal. Apr. 1, 1991), *quoting* Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3rd Cir. 1976). In Estelle, the Court recognized that medical needs constitutionally requiring medical attention ranged from "the worst cases," producing "physical torture or a lingering death," to "less

serious cases," resulting from the "denial of medical care," which could cause "pain and suffering." Estelle, 429 U.S. *1187 at 103, 97 S.Ct. at 290. Because "society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian 112 S.Ct. 995, 1000 (1992); Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176 (11th Cir 1994). A "serious" medical need has been defined as "one that has either been diagnosed by a physician as requiring medical treatment, `or one that is so obvious that even a lay person would recognize the need for a doctor's attention.`" Evans, 1991 WL 43695, at *1, quoting Laaman v. Helgemoe, 437 F.Supp. 269, 311 (D.N.H. 1977). See also Page v. Sharpe, 487 F.2d 567, 569 (1st Cir. 1973). It is the necessity and not the desirability of medical treatment sought which is important to the determination of whether medical officials have exhibited deliberate indifference. Woodall v. Foti, 648 F.2d 268 (5th Cir. 1981).

In this case, the evidence simply fails to establish that the two individual defendants, Mullins and Cook, were deliberately indifferent to plaintiff's medical needs in a way that caused or aggravated them. Plaintiff suffered from chronic infections of his eye socket, as evidenced by a long series of problems and complaints from dating well before he was transferred to Limestone. While there may have been short periods when "2 x 2" gauze was substituted for "4 x 4," or when plaintiff was given plastic safety glasses and a metal eye patch rather than cloth ones, there never was a time when it can be said that Mullins and Cook were not attempting to assist plaintiff with the protection and treatment of his eye socket. He complains that they substituted TAO for Neosporin, but the medical record makes clear the he often had been treated with TAO before going to Limestone and that the changes were ordered by physicians. In any event, Mullins and Cook could supply him only

with the antibiotic they had available to them. If the pharmacy substituted a different antibiotic or if a physician ordered a change, they had no control over it.

It is true that plaintiff's eye socket continued to deteriorate after his arrival at Limestone, but this was the result of the chronic infection that persisted for well over ten years before and after he arrived at Limestone. The medical record documents clearly the efforts of CMS physicians, in conjunction with doctors at the Eye Foundation Hospital, to combat the chronic infection. The evidence does not establish that Mullins or Cook denied plaintiff the needed medical supplies, or that short-term shortages of supplies materially aggravated his condition. The plaintiff has failed to carry his high burden of showing that Mullins and Cook were deliberately indifferent to his needs. They are entitled to judgment on this claim.

B. *Alabama Medical Liability Act*

Plaintiff's alternative claim against Mullins, Cook, and, under *respondeat superior*, CMS is an allegation that Mullins' and Cook's failure to provide him with needed medical supplies for cleaning and medicating his eye socket violated the standard of care owed to him by these nurses under the Alabama Medical Liability Act. This claim also is unsuccessful, however, because plaintiff has failed to prove the standard of care required of the nurses in these circumstances, and he has failed to prove that anything they did causally contributed to his injuries.

Under the Alabama Medical Liability Act of 1987, the plaintiff has the burden of proving by substantial evidence that the accused health-care provider "failed to exercise such reasonable care, skill and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in a like case." Alabama Code § 6-5-548(a). Alabama courts have construed this provision to require in most cases that the plaintiff offer an expert witness who

10

qualifies as a health care provider in the same general line of practice as the defendant to testify to the standard of care applicable to the defendant. Absent such testimony disputing the defendant's testimony that he or she met the appropriate standard of care, the defendant is entitled to judgment. Swendsen v. Gross, 530 So. 2d 764 (Ala. 1988). An exception to this general proposition is when the "want of skill or lack of care is so apparent as to be understood by a layman, and only common knowledge and experience are required to understand it. . . ." Walker v. Southeast Alabama Medical Center, 545 So.2d 769 (Ala. 1989).

Plaintiff argues here that the want of skill and care exhibited by Nurses Mullins and Cook fall into the exception, enabling him to prove a violation of the standard of care without the testimony of a nursing expert. But the evidence is much more subtle than plaintiff allows. There was no credible evidence that the defendants wholly failed to provide him with medical care, such as would be so apparent that a layman could understand the breach of the standard of care. Rather, the evidence showed that on occasion, the defendants substituted "2 x 2" gauze for "4 x 4" gauze, used TAO ointment instead of Neosporin because that was what the pharmacy had, and offered plaintiff safety glasses and a metal eye patch as alternatives to cloth eye patches. Whether these deviations from the orders of the physicians violated the standard of care expected of nurses is not readily apparent, and not one that can be understood by the layman without expert testimony. Both Nurse Mullins and Nurse Cook testified that they complied with the standard of care required of them as an RN and LPN, respectively. Absent some disputing testimony from the plaintiff to show a violation of the standard of care, defendants are entitled to judgment.

Additionally, even if it could be determined that defendants violated a nursing standard of care, the evidence fails to show that the deviations and substitutions they made causally contributed to the deterioration and aggravation of his chronically infected eye socket. Again, plaintiff had the

11

burden of proving by substantial evidence that the want of skill or care by the defendants "proximately cause[d] personal injury . . .." Alabama Code § 6-5-542(2).  No evidence was offered here to prove that causal link between the defendants' deviations from and substitutions for the ordered treatment and the deterioration of plaintiff's eye socket.  No expert testified that the injuries plaintiff suffered would not have occurred if defendants had followed orders to the letter.  An equally likely conclusion is that he had a long-term, chronic infection that was resistant to treatment, and that the socket would have worsened even if defendants had followed the treatment orders strictly to the letter.  In such equipoise, the plaintiff has failed to carry his burden of proof.  Defendants are entitled to judgment on this claim.

Conclusion

In conclusion, the court finds that defendants are entitled to judgment, plaintiff having failed to carry his heavy burden of proving a violation either of his Eighth Amendment rights or of the Alabama Medical Liability Act.  A separate judgment will be entered in favor of defendants.

DONE this 27th day of August, 1999.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

12